IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**RUBICON GLOBAL VENTURES, INC.,**
**an Oregon corporation; and Z MOTORS,**
**INC., an Oregon corporation,**

        Plaintiffs,

   v.

**CHONGQING ZONGSHEN GROUP**
**IMPORT/EXPORT CORP., a foreign**
**corporation; CHONGQING ZONGSHEN**
**GROUP, a foreign corporation;**
**ZONGSHEN INDUSTRIAL GROUP, a**
**foreign corporation; ZONGSHEN**
**INDUSTRIAL GROUP, CO. LTD, a**
**foreign corporation also known as**
**Zongshen Industrial Group; and**
**DEXIU YUAN,**

        Defendants.

No. 3:09-cv-00818-MO (Lead Case)

OPINION AND ORDER

**MOSMAN, J.,**

    This matter comes before the Court on remand from the Ninth Circuit to make a factual

determination of Plaintiffs' damages in Docket Nos. 3:05-cv-01809 ("*Rubicon I*"), 3:09-cv-

00818 ("*Rubicon II*"), and 3:09-cv-01397 ("*Rubicon III*").  Also before the Court is Defendants'

Motion to Preclude Entry of Default Judgment on Plaintiffs' Claims [303]. After considering the

1 – OPINION AND ORDER

information and evidence presented at the hearing, I find Plaintiffs' sufficiently proved damages in the amount of $916,650. For the reasons stated below, however, I GRANT Defendants' Motion and preclude the entry of default judgment in this consolidated action. Plaintiffs are, therefore, awarded no damages.

## BACKGROUND

The history of this consolidated action is long and tortuous. In 2004, Defendants allegedly approached Plaintiffs about establishing a joint venture in which Plaintiffs would market and sell Defendants' motorbikes in the United States. Plaintiffs eventually incorporated and ordered three containers of the motorbikes from Defendants. Plaintiffs received the first two containers, but the third was seized by United States Customs and Border Protection because the motorbikes failed to meet relevant emission standards. Plaintiffs claim that Defendants falsified the emissions testing records and misrepresented that the motorbikes were legal to sell in the United States. Additionally, Plaintiffs claim the motorbikes they *did* receive had numerous mechanical issues. Plaintiffs stored the motorbikes and eventually sold them to a wholesaler for a discounted price.

Based on these factual allegations, Plaintiffs eventually filed five civil actions, of which only three remain (*Rubicon I*, *Rubicon II*, and *Rubicon III*). This Court originally entered default judgments in all three cases but then vacated those judgments based on improper service and issues with personal jurisdiction. Plaintiffs appealed the orders vacating the default judgments, and the Ninth Circuit held that, at least in regard to some defendants, service and the exercise of personal jurisdiction had been proper. On remand, this Court reinstated the default judgments against Defendants in the total amount of approximately $325 million. This time, Defendants appealed, arguing that the Court should not have reentered the default judgments without first

2 – OPINION AND ORDER

holding a hearing on the issue of damages. The Ninth Circuit agreed, vacated the default judgments, and remanded the cases to this Court for a factual determination of damages. Prior to the evidentiary hearing, Defendants filed a Motion to Preclude Entry of Default Judgment [303], raising arguments as to the sufficiency of Plaintiffs' claims. The hearing to determine Plaintiffs' damages was held on October 18, 2016.

## DISCUSSION

### I.      Defendants' Participation in the Hearing

Prior to the evidentiary hearing on October 18, I had to decide whether Defendants should be allowed to participate in the hearing at all. Even though there is disagreement regarding a defaulting party's right to notice of a damages hearing, courts generally agree that a defaulting party has "the right to participate in such a hearing." B. Finberg, Annotation, *Defaulting Defendant's Right to Notice and Hearing as to Determination of Amount of Damages*, 15 A.L.R. 3d 586 (1967). This does not mean the defaulting party may present evidence going solely to liability, but she "may cross-examine the opposing witnesses and introduce evidence on [her] own behalf in *mitigation of the damages*." *Id.* (emphasis added); *see also Henry v. Sneiders*, 490 F.2d 315, 318 (9th Cir. 1974) (concluding that exclusion of the defendant's evidence was proper because it went to liability rather than damages); *Oire Or. C, LLC v. Yaldo*, No. CV 08-724-ST, 2008 WL 5071709, at *1 (D. Or. Nov. 25, 2008) (holding that a defendant in default was entitled to be heard on the issue of damages).

Plaintiffs argued that Defendants should not participate in the hearing because allowing them to do so would encourage parties "to sit on their hands, knowing that far down the road they can appear and be afforded full participation." Additionally, Plaintiffs claimed that *Henry*

was distinguishable because there, the court entered default as a discovery sanction, whereas here, Defendants' default was due to their complete lack of response.

These arguments are unconvincing. First, Defendants were not awarded "full participation" as Plaintiffs suggested. Rather, in accordance with the rule above, Defendants were limited to cross-examining Plaintiffs' witnesses and presenting their own evidence on the issue of damages *only*. They were not allowed to present evidence on the issue of liability because all factual allegations from the Complaints were established as true upon entry of default. *See Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977) (citation omitted) ("The general rule of law is that upon default the factual allegations of the complaint, except those in relation to the amount of damages, will be taken as true). Furthermore, the distinction from *Henry* is irrelevant because regardless of the reason Defendants defaulted, they were present and active in this case at the time the evidentiary hearing was held. In fact, their involvement prior to the hearing was extensive, and forbidding them from participating at this point would be incongruent with modern treatment of defaulting parties. *Cf. Mendoza v. Wight Vineyard Mgmt.*, 783 F.2d 941, 945-46 (9th Cir. 1986) ("Where timely relief is sought from a default . . . and the movant has a meritorious defense, doubt, if any, should be resolved in favor of the motion to set aside . . . ." (citation omitted) (internal quotation marks omitted)); Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2681 (4th ed. 2016). For these reasons, I found it proper to allow Defendants to participate in the evidentiary hearing on damages.

In any event, I am confident I would have reached the same conclusion on damages even without Defendants' participation in the hearing. At the hearing and in their *Daubert* Motion, Defendants' questioned the experts' qualifications to testify as to Plaintiffs' economic damages

and the overall reliability of the experts' opinions. These issues were not novel; they were precisely the questions I would have raised at the hearing even if Defendants were not present. Thus, in the end, my decision to allow Defendants to participate did not impact my damages calculation.

## II.    Plaintiffs' Damages

After default is entered against an unresponsive party, the court may enter a default judgment and award damages in favor of the plaintiff. Fed. R. Civ. P. 55(b) (West 2015). The judgment may not be entered without a hearing, however, "unless the amount claimed is a liquidated sum or capable of mathematical calculation." *Davis v. Fendler*, 650 F.2d 1154, 1161 (9th Cir. 1981) (citation omitted). Following an entry of default, the facts in the complaint are taken as true, but "neither the default nor the allegations in the complaint can establish the amount of damages." *Lasheen v. Embassy of the Arab Republic of Egypt*, 625 F. App'x 338, 341 (9th Cir. 2015) (*cert. denied sub nom. Embassy of Arab Republic of Egypt v. Lasheen*, 136 S. Ct. 2388 (2016)); *see also TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1987). Thus, before the court can enter a default judgment on a sum uncertain, the plaintiff must *prove* its damages. *Joe Hand Prods. v. Holmes*, No. 2:12-CV-00535-SU, 2015 WL 5144297, at *3 (D. Or. Aug. 31, 2015) (citing *Heidenthal*, 826 F.2d at 917-18)).

In this case, Plaintiffs seek compensatory damages for lost profits ($45,485,576) and lost investment (approximately $505,550) and argue those damages should be trebled under federal and state RICO statutes. Plaintiffs also seek an award of punitive damages. I will address each type of damages in turn.[1]

---

[1] The parties looked to Oregon law for what needs to be shown to prove damages for lost profits and lost investment. Oregon law obviously supplies the standard for the state law claims, but for the RICO claim, federal law governs. Accordingly, damages under RICO, which can include lost profits, "must be established by competent proof, not based upon mere speculation or surmise." *Ticor Title Ins. Co. v. Florida*, 937 F.2d 447, 451 (9th Cir. 1991) (citation

A.  *Future Lost Profits*

i.  **The Governing Standard**

In order to recover damages for future lost profits, a party must establish the amount of such profits with reasonable certainty. *Peterson v. McCavic*, 277 P.3d 572, 579 (Or. App. 2012). Loss of future profits may be established by "past profits of an established business" or "expert projections based upon tests performed under substantially similar conditions." *Willamette Quarries, Inc. v. Wodtli*, 781 P.2d 1196, 1200 (Or. 1989). Mere "testimony of unverifiable expectations of profits," however, is insufficient. *Id.* Ultimately, whether the party seeking damages has sufficiently proved lost profits is a question of fact for the jury. *Peterson*, 277 P.3d at 579.

Even though the reasonable certainty standard for proving lost profits is well-established under Oregon law, applying it in this case raises additional issues. First, the standard uses admittedly ambiguous phrasing that leaves open what is actually required. A party must prove lost profits with certainty but only to a degree that is reasonable; in other words, proof that is to some degree uncertain. Oregon courts have explained that the word "certainty" is a misnomer and actually means something closer to probability. *See, e.g.*, *Cont'l Plants Corp. v. Measured Mktg. Serv., Inc.*, 547 P.2d 1368, 1370-71 (Or. 1976). Indeed, the standard is not a demanding one; "reasonable probability is all that is required." *Tadsen v. Praegitzer Indus., Inc.*, 928 P.2d 980, 983-84 (Or. 1996); *Peterson*, 277 P.3d at 579 (quoting *City of Eugene v. Monaco*, 17 P.3d

omitted) (internal quotation marks omitted); *see also Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 521 (1985); *Altamont Summit Apartments LLC v. Wolff Props. LLC*, No. CIV.01-1260-BR, 2002 WL 926264, at 14 (D. Or. Feb. 13, 2002). How this standard of "competent proof" compares to the state law standard of "reasonable certainty" is not immediately clear. The parties seem to assume, however, that the evidence necessary to prove compensatory damages is essentially the same for all the claims at issue. In at least one other case involving both state law and RICO claims, a federal circuit court seems to have operated under a similar assumption. *See Whitfield v. John Bourne Co.*, 16 Fed. App'x 116, 121-22 (4th Cir. 2001). I too am willing to accept this assumption and analyze Plaintiff's compensatory damages under a standard of reasonable certainty only. In any event, analyzing the evidence under a standard of "competent proof" would produce the same result.

544 (Or. App. 2000). Thus, even though the appropriate standard is reasonable certainty and not a preponderance of the evidence, the standard seems to require only that the claimed amount of lost profits be more likely true than not.

More importantly, there is a question as to whether the standard for demonstrating lost profits differs in situations of default. Although neither Oregon courts nor the Ninth Circuit applying Oregon law has directly addressed this issue, other federal appellate courts sitting in diversity have noted that in situations of default, a party must still prove its actual damages to a reasonable degree of certainty. *See, e.g.*, *Everyday Learning Corp. v. Larson*, 242 F.3d 815, 819 (8th Cir. 2001) (applying Minnesota state law); *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999) (applying New York state law). Additionally, district courts within the Ninth Circuit have required plaintiffs to prove lost profits or other compensatory damages with "reasonable certainty" even in situations of default. *See, e.g.*, *Jones v. Zimmer*, No. 2:12-cv-01578-JAD-NJK, 2016 WL 1122852, at *2 (D. Nev. Mar. 22, 2016); *eAdGear, Inc. v. Liu*, No. CV-11-05298 JCS, 2012 WL 2367805, at *18 (N.D. Cal. June 21, 2012). I am therefore persuaded that the standard for proving lost profits under Oregon law would not change simply because a court has entered default against one of the parties.

There are also no principled reasons to deviate from the general standard of proving lost profits simply because a party has defaulted. Due process concerns weigh against finding a more lenient standard and the difficulty of proving damages weighs against one that is overly stringent. To be sure, courts have applied a number of "modifying principles" to avoid the "overly rigid application of the 'reasonable certainty' requirement." *Mid-Am. Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1365 (7th Cir. 1996). Where a defendant's wrongdoing makes quantification difficult, for example, courts have allowed plaintiffs additional leeway in

estimating their amount of damages. *Id.*; *Domanus v. Lewicki*, 742 F.3d 290, 303 (7th Cir. 2014); *see also Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931) ("Where the tort itself is of such a nature as to preclude the ascertainment of the amount of the damages with certainty . . . it will be enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate."). I have found no case, however, in which a court modified or changed the standard for proving lost profit damages merely because default had been entered against one of the parties.[2] As a practical matter, a party's damages for lost profits may be easier to prove in default situations because there is no opposing party to present contravening evidence, but this does not mean the standard itself is different. Rather, regardless of whether default has been entered pursuant to Rule 55(a), damages for future lost profits must be proven with reasonable certainty.

### ii.  Plaintiffs' Failure to Prove Lost Profits

In this case, Plaintiffs have failed to prove their future lost profits with reasonable certainty. Plaintiffs rely principally on numbers and projections from their 2004 business plan (the "Plan"). There are two problems with this evidence: the first concerns assumptions the Plan did take into account and the second concerns risk factors the Plan did not take into account.

The Plan makes several aggressive assumptions in regard to Plaintiffs' projected business growth that appear lofty at best, and impossible at worst.  Specifically, over a five-year period, the Plan projects an increase in the markets served from 2 to 140, an increase in dealership

---

[2] Plaintiffs rely principally on *Domanus* to argue that the standard for proving lost profit damages is "relaxed" in a default setting. This reliance, however, is misplaced. In *Domanus*, the Seventh Circuit noted that courts have "broad latitude in quantifying damages." 742 F.3d at 303. Even though default had been entered against the defendant for discovery abuses, however, the Seventh Circuit did not limit its statement about "broad latitude" to situations of default. *Id.* In fact, nothing the court said contradicts the requirement that a plaintiff prove lost profit damages with reasonable certainty, even in cases of default. The "reasonable certainty" standard is not as rigid as it sounds, meaning that courts *do* have "broad latitude" in assessing damages. *See id.* Additionally, in *Domanus*, the court seems to attribute its "broad latitude" in regard to the plaintiff's damages to the fact that the defendant's conduct "impede[d] quantification;" not to the fact that default had been entered. *Id.* at 303.

agreements from 2 to 280, and an increase in units sold from 236 to 73,600. On the basis of these assumptions, the company stood to grow from an initial investment of $1.5 million to an overall value of approximately $600 million. To prove the validity of the Plan's assumptions, Plaintiffs offered expert testimony from William Rucker. Mr. Rucker is the manager and founder of Texas Environment Technology ("TET"), a full-service emissions testing laboratory. He was also CEO and president of American Ironhorse, a niche, high-end motorcycle manufacturing company that experienced growth of $200 million in just over eight years.

Mr. Rucker opined that the Plan's assumptions were reasonable, and even conservative. His conclusions, however, are problematic. First, even though he might have been qualified to comment on the validity of the Plan's assumptions,[3] he expressly admitted that he did not undertake any independent analysis of the assumptions to reach his conclusions.[4] Rather, he relied completely on his own experience in the motorcycle industry and observations of market trends to determine the assumptions were reasonable. Essentially, the core of Mr. Rucker's opinions were based on the idea that because he achieved remarkable growth in his own business, the growth predicted by the Plan was "reasonable." Just because X happened once, however, does not prove to a reasonable degree of certainty that X will happen again. It shows that such growth is possible, but it does not necessarily show that such growth is probable.

Moreover, Defendant's expert, Sharif Farhat, testified that the Plan's assumptions were highly unreasonable. Mr. Farhat is the Vice President of Expert Analytical Services at Urban Science Applications, a consulting and software development company. He has performed

---

[3] Defendants submitted a *Daubert* Motion, in which they argued, in part, that Mr. Rucker was not qualified to provide expert opinion on Plaintiffs' economic damages. Even if he was not qualified to opine as to Plaintiffs' economic damages, he might have been qualified to comment on the reasonableness of the assumptions in the Plan. Because his opinions on the assumptions were otherwise unreliable, however, I need not decide the issue of whether he was qualified.

[4] *See Magnetar Techs. Corp. v. Intamin, Ltd.*, 801 F.3d 1150, 1159 (9th Cir. 2015) (suggesting that an expert who relies on a business plan must independently assess the merits of such plan).

hundreds of analyses on the financial performance of different motor vehicle dealer networks and has served as an expert on dealer networks in numerous state and federal cases. Mr. Farhat testified that the Plan's predictions were highly speculative and that he was unaware of any company in the relevant industry achieving similar results in the last 20 to 30 years. He also challenged Mr. Rucker's statements regarding the ease of signing up dealers, underlining several challenges that new companies face in establishing a robust dealer network. These competing statements reinforced the problems with Mr. Rucker's opinions and prevented Plaintiffs from adequately proving that the Plan's assumptions were reasonable.

Even if Mr. Rucker's testimony was sufficient to prove the assumptions were reasonable, it does not follow that Plaintiffs would have proved their lost profits with reasonable certainty. In fact, determining whether the Plan's assumptions for gross profitability were reasonable is several steps removed from proving Plaintiffs' future lost profits. Mr. Rucker did not provide any analysis on the price of each individual unit, Plaintiffs' expenses, or other risk factors that would have affected Plaintiffs' expected profits. In fact, Mr. Rucker admitted that he was in no position to provide opinion on Plaintiffs' economic damages at all.

Furthermore, the Plan and Mr. Rucker's assessment also fail to account for several important risk factors that are essential to consider when determining a party's likely future profits. These risk factors include inexperienced management teams, the lack of proven market acceptance for a particular product, and a general high rate of failure for new businesses. Mr. Farhat testified, for example, that Plaintiffs' proposed leadership team did not have the necessary expertise in the powersports industry to establish a dealer network the size of that projected in the Plan. Additionally, Defendants' other expert, Jay Sickler, referenced a 75 percent failure rate for new businesses and testified that the rate is higher for venture capital startup companies than

those that are closely held.[5] Despite their glaring presence, the Plan completely fails to account for how these risk factors will affect Plaintiffs' ability to make a profit. Rather, the Plan ignores these risks and predicts an outcome that would result in a once-in-a-generation return on the initial equity investment.

Essentially, the Plan predicted a cold-fusion-type scenario in which Plaintiffs' would be able to sell high-quality goods at low cost while achieving a high profit margin. Plaintiffs presented insufficient evidence, however, that the assumptions upon which the scenario depended were reasonable independent of the Plan. Furthermore, the Plan failed to account for several factors that would potentially – and even probably – reduce the amount of profits that Plaintiffs stood to make. In short, the Plan's predicted scenario was highly speculative. As such, Plaintiffs have failed to meet their burden of proving future lost profits with reasonable certainty.

**B.** *Lost Investment*

Plaintiffs were also required to prove damages for their lost investment with reasonable certainty. *Parker v. Harris Pine Mills*, 291 P.2d 709, 713 (Or. 1955) ("In every case actual damages sustained must be established by evidence upon which their existence and amount may be determined with reasonably certainty."); *Bixler v. First Nat'l Bank of Or.*, 619 P.2d 895, 900 (Or. App. 1980) ("Actual damages must be established by evidence upon which their existence and amount may be determine with reasonable certainty . . . .").[6] Unlike with lost profits,

---

[5] Even though Defendants' experts testified extensively as to these risk factors, several of them – e.g., the general failure rate of startups – are obvious, and the Court would have recognized the Plan's failure to address them even without Defendants' participation in the hearing.

[6] There is at least one Oregon case that suggests the correct standard for determining lost investment damages is a preponderance of the evidence. *See SnB, Incorporation v. Ehlers*, 779 P.2d 625, 626-27 (Or. App. 1989) ("The [trial] court found that plaintiff had failed to establish the damages [which included damages for lost investment] by a preponderance of the evidence."). As already explained above, even though proof to a reasonable degree of certainty does not equal a preponderance of the evidence, both standards seem to require a similar showing of proof. Ultimately, the distinction is somewhat unimportant as Plaintiffs' evidence for lost investment damages would satisfy either standard.

however, Plaintiffs' evidence as to the amount of their lost investment was sufficient to satisfy the standard.

Plaintiffs' damages claim for lost investment is relatively straightforward: investors provided capital for the joint venture, Plaintiffs expended that capital in furtherance of the venture, and as a result of Defendants' conduct, Plaintiffs were unable to recover such capital. The amount invested in the company, and the amount being claimed as damages, is $505,550. As proof of this amount, Plaintiffs provided charts and account information listing each individual investor and the amount that he or she invested in the company. Plaintiffs' witness Todd Silberman verified this investment amount and testified that the money was spent entirely on Plaintiffs' operating costs. Importantly, because liability was established upon entry of default, Plaintiffs did not need to prove Defendants' conduct was the cause of their inability to recover the expended capital.

Defendants' presented no contrary evidence that the initial investment amount was less than what Plaintiffs claimed. They merely argued that because Plaintiffs had not provided "detailed support" of the amounts expended, Plaintiffs had not met their burden of establishing damages of lost capital. I disagree. Although Plaintiffs did not provide documentary evidence of their exact expenditures, Mr. Silberman's uncontroverted live testimony was sufficient to show that the entire amount of initial investment had been lost. Absent any evidence to the contrary, this testimony, along with the documentary evidence described above, was sufficient to prove Plaintiffs' damages for lost capital to a reasonable degree of certainty.

Even though Plaintiffs provided sufficient evidence of their damages for lost capital, both parties agree that Plaintiffs claimed amount of $505,550 should be reduced by $200,000 to

reflect the amount Plaintiffs received in settlement from Zongshen, Inc. Thus, I reduce Plaintiffs'

damages of lost capital to $305,550.

### C. *Treble Damages Under RICO*[7]

Under RICO, the measure of civil damages is "the harm caused by the predicate acts

constituting an illegal pattern." *Ticor Title Ins. Co. v. Florida*, 937 F.2d 447, 451 (9th Cir. 1991)

(citation omitted). These damages "must be established by competent proof, not based upon

mere speculation or surmise." *Id.* Assuming a plaintiff can provide competent proof, its damages

may be trebled as allowed by statute. 18 U.S.C.A. § 1964(c) (West 2016).

For the same reasons discussed above, Plaintiffs have failed to establish by "competent

proof" that they are entitled to damages for future lost profits. Plaintiffs are entitled, however, to

damages for their lost investment in the amount of $305,550. Because liability has been

established by virtue of default, these damages are deemed to be "caused by the predicate acts

constituting an illegal pattern" and should be trebled. As such, Plaintiffs would be entitled to a

damages award of $916,650, absent the insufficiency issues discussed more fully below.

### D. *Punitive Damages*

Plaintiffs also seek punitive damages in connection with their fraud and ORICO claims.

In Oregon, a party may recover punitive damages in a civil action if it proves by clear and

convincing evidence that "the party against whom punitive damages are sought has acted with

malice or has shown a reckless and outrageous indifference to a highly unreasonable risk of harm

and has acted with a conscious indifference to the health, safety and welfare of others." Or. Rev.

Stat. Ann. § 31.730(1) (West 2016). "[M]alice has been held to mean the intentional doing of

---

[7] RICO and ORICO are "almost identical" and the state statute is interpreted consistently with the federal statute. *Pincetich v. Jeanfreau*, 699 F. Supp. 1469, 1475 (D. Or. 1988) (citing *Ahern v. Gaussoin*, 611 F. Supp. 1465, 1494 (D. Or. 1985). Thus, although I only discuss Plaintiffs' ability to treble damages under RICO, the same outcome would apply for a damages award under ORICO.

[an] injurious act without justification or excuse. *Johannesen v. Salem Hosp.*, 82 P.3d 139, 141 (Or. 2003) (quoting *Linkhart v. Savely*, 227 P.2d 187 (Or. 1951)). To satisfy the clear and convincing standard, the "evidence must establish that the truth of the facts asserted is 'highly probable.'" *Riley Hill Gen. Contractor v. Tandy*, 737 P.2d 595, 602 (Or. 1987).

Plaintiffs argue that Defendants' malice has been established by virtue of the default. In situations of default only factual allegations relating to liability are binding upon the defaulting party. *Alan Neuman Prods., Inc. v. Albright*, 862 F.2d 1388, 1392 (9th Cir. 1988) (citation omitted). Thus, in this case, the factual allegations relating to the fraud and ORICO claims – the sources of Plaintiffs' punitive damages claim – are binding on Defendants. Malice,[8] however, is not an element of ORICO or common law fraud, and thus has not been established by the entry of default. *See* Or. Rev. Stat. Ann. §§ 166.715 *et seq.* (West 2016); *Strawn v. Farmers Ins. Co. of Or.*, 258 P.3d 1199, 1209 (Or. 2011); *see also Alutiiq Int'l Sols., LLC v. OIC Marianas Ins. Corp.*, 149 F. Supp. 3d 1208, 1215 (D. Nev. 2016) (citing *Matter of Gober*, 100 F.3d 1195, 1205 (5th Cir. 1996) ("When punitive damages are sought by default judgment, the court must have independent evidence to support the award because punitive-damages-worthy conduct alleged in a complaint is not regarded as admitted by default."). In order to warrant an award of punitive damages, Plaintiffs were required to prove the existence of malice by clear and convincing evidence.[9] § 31.730; Or. Uniform Civil Jury Instructions No. 75.02 (2015).

Although Plaintiffs provide some evidence to support a finding of malice, it is not enough to satisfy the clear and convincing standard. Plaintiffs provided evidence that Michael Johnson,

---

[8] I use "malice" as shorthand for "malice or . . . a reckless and outrageous indifference to a highly unreasonable risk of harm" as required by the Oregon statute on punitive damages.

[9] In *Riley Hill*, the Oregon Supreme Court held stated "when considering the issue of damages, be they general or punitive, the judge should instruct the jury that the proponent need only prove those damages by a preponderance." 737 P.2d at 606. This language might suggest that although proving malice requisite to justify an award of punitive damages requires clear and convincing evidence, proof of a specific amount of damages need only be by a preponderance. In light of the clear wording of the statute, however, I find the appropriate standard to be clear and convincing evidence. Regardless, Plaintiffs failed to present adequate proof to satisfy either standard.

14 – OPINION AND ORDER

an independent contractor for Texas Environmental Technology ("TET"), pled guilty to submitting false applications for motorcycle certifications to the Environmental Protection Agency ("EPA"). Mr. Rucker also testified that even though Mr. Johnson claimed to have certified Defendants' products, TET had no record of this testing, meaning the reports Defendants submitted to the EPA were false. Admittedly, this evidence is consistent with a scenario in which Defendants deliberately defrauded the government by obtaining false EPA certifications. On its own, however, it is insufficient to make such scenario "highly probable."

The evidence submitted proved that Mr. Johnson – not defendants – engaged in fraudulent activity against the government. Indeed, it is only by inference that one arrives at the conclusion that Defendants intentionally sought to defraud the government or Plaintiffs. To be clear, the fact that the fake certificates were submitted to the government would not prevent Plaintiffs from establishing a claim for punitive damages based on a fraudulent representation that the motorbikes were EPA-compliant. Plaintiffs must still provide sufficient evidence, however, to show that Defendants' intentional participation in the "injurious act" was highly probable and not merely possible or plausible. Plaintiffs fell short of this relatively high standard and thus their claim for punitive damages fails.

Even if malice was established by virtue of the default, it is not clear that Plaintiffs would have been entitled to an award of punitive damages. Plaintiffs did not allege an amount in connection with their punitive damages claim, instead directing the court to award an amount that was "significant." Even though there is no fixed standard for determining the amount of punitive damages, the factors the court must consider seem to assume the existence of at least a claimed number. *See* Or. Uniform Civil Jury Instructions No. 75.02 (2015) ("The amount of punitive damages you award may not exceed $_____ [prayer], [which is the *amount requested by*

*the plaintiff*]." (emphasis added)). Furthermore, as discussed more below, there are significant sufficiency problems with Plaintiffs underlying claims that ultimately preclude an award of punitive damages.

### III.    Defendants' Motion to Preclude Entry of Default Judgment

Even though Plaintiffs have adequately proven damages in the amount of $916,650, the question of whether they are entitled to a default judgment at all is still before me. In the remaining civil actions, Plaintiffs allege four claims: (1) violation of federal RICO ("RICO claim"); (2) violation of Oregon RICO ("ORICO claim"); (3) common law fraud ("fraud claim"); and (4) common law breach of contract, breach of the covenant of good faith and fair dealing, and breach of the warranty of merchantability ("contract claims"). Leading up to the evidentiary hearing, Defendants filed a Motion to Preclude Entry of Default Judgment [303], arguing that these claims are legally insufficient and cannot form the basis of a valid default judgment. Plaintiffs reject Defendants' sufficiency arguments and assert that, regardless of merit, the arguments are procedurally barred. I agree with Defendants and, therefore, preclude entry of default judgment.

### A.  *Procedural Arguments*

#### i.  **Challenging the Sufficient of Pleadings After an Entry of Default Generally**

In general, facts that are not supported by the pleadings cannot properly form the basis of a default judgment. *Alan Neuman Prods., Inc. v. Albright*, 862 F.2d 1388, 1392 (9th Cir. 1988) (citation omitted). Thus, a district court may refuse to enter judgment against a defaulting party when the claims against the party are not sufficiently pled. *See DIRECTV, Inc. v. Hoa Huynh*, 503 F.3d 847, 854 (9th Cir. 2007) (upholding district court's refusal to enter default judgment due to a deficiency in the pleadings). Additionally, "on appeal, [a] defendant, although he may

16 – OPINION AND ORDER

not challenge the sufficiency of the evidence, is entitled to contest the sufficiency of the complaint." *Alan Neuman Prods.*, 862 F.2d at 1392; *see also Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d 1261, 1267 (9th Cir. 1992) (citation omitted) ("[N]ecessary facts not contained in the pleadings, and claims which are legally insufficient, are not established by default."). Thus, even if default judgment has been entered against a defendant, the defendant may challenge the sufficiency of pleadings on which the judgment is based.

Relying on these arguments, Defendants challenge the legal sufficiency of Plaintiffs' claims, despite the Court's previous entry of default. Plaintiffs respond, in part, by arguing that a defendant can only challenge the sufficiency of pleadings after default on appeal. Nothing in the above opinions, however, explicitly limits their application to cases on appeal. Furthermore, if insufficient claims cannot form the basis of a default judgment, a party should be able to challenge such claims regardless of whether the case is on appeal or remand. Thus, Defendants are not categorically precluded from making their sufficiency arguments at this stage of the litigation.

### ii.  Rule of Mandate and Law of the Case Doctrines

Even though a party may generally raise sufficiency arguments following an entry of default, its ability to do so might be limited by the rule of mandate or law of the case doctrines. In other words, a party can only make insufficiency arguments on remand if the appellate court's mandate or law of the case does not otherwise preclude it from doing so.[10] Under the law of the case doctrine, "a court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case." *Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993). For the doctrine to apply, however, "the issue in question must have

---

[10] This position is not inconsistent with *Alan Neuman Products*, 862 F.2d at 1392. The defendant's sufficiency argument in *Alan Neuman Products* did not implicate the law of the case, leaving the defendant free to make such an argument. *See id.*

been decided either expressly or by necessary implication in [the] previous disposition." *Id.*

(citation omitted). The rule of mandate is similar to the law of the case doctrine but somewhat

broader. *Hall v. City of Los Angeles*, 697 F.3d 1059, 1067 (9th Cir. 2012). It stands for the

proposition that an inferior court "cannot vary or examine [an appellate court's mandate] for any

purpose other than executing it." *Id.*

In this case, Plaintiffs argue that both doctrines preclude Defendants from making their

sufficiency arguments at this stage of the litigation. Specifically, Plaintiffs point to the Ninth

Circuit's Mandate from the second appeal (the "Mandate") and a 2013 Order from Judge

Haggerty (the "2013 Order") as establishing the sufficiency of Plaintiffs' claims and precluding

consideration of Defendants' Motion. I will address each of Plaintiffs' arguments in turn.

### a) Rule of Mandate

When a case is on remand, an inferior court is bound by the appellate court's mandate

and "must carry it into execution." *Vizcaino v. U.S. Dist. Court for W. Dist. of Wash.*, 173 F.3d

713, 719 (9th Cir. 1999). Although the inferior court may consider issues "not expressly or

impliedly disposed of on appeal," it must follow "both the letter and spirit of the mandate." *Id.*

(citations omitted); *see also United States v. Kellington*, 217 F.3d 1084, 1092-93 (9th Cir. 2000).

Usually, the terms of the appellate court's mandate are clear and unequivocal, making execution

of the mandate relatively "uncontroversial." *Kellington*, 217 F.3d at 1093. If, however, the

inferior court encounters issues the appellate court did not address, it has discretion to consider

the issues so long as doing so does not contravene the intentions of the higher court. *See id.* at

1092.

In *Hash v. United States*, for example, the district court construed the circuit court's

mandate as requiring a determination of "just compensation" but precluding additional

consideration of the defendant's liability. No. CV-99-324-S-MHW, 2007 WL 1309548, at *4 (D. Idaho Feb. 1, 2007).[11] Even though the mandate did not explicitly address the disputed issue, the district court found that reading the mandate in conjunction with circuit court's opinion showed the circuit court itself "made the liability determination." *Id.* Thus, on remand, the district court was only to consider the issue of compensation. *Id.*

In its Mandate and accompanying Memorandum, the Ninth Circuit does not explicitly discuss whether this Court may consider Defendants' sufficiency argument on remand. Instead, the Ninth Circuit simply directs this Court to vacate the default judgment and factually determine Plaintiffs' damages. Moreover, unlike in *Hash*, there is nothing to suggest that the sufficiency of Plaintiffs' claims was impliedly disposed of on appeal or that considering such argument on remand would contravene the spirit of the Mandate.[12] Rather, the Ninth Circuit based its decision to vacate the default judgment completely upon this Court's failure to hold a damages hearing; no party had even raised the issue of whether Plaintiffs' claims were properly pled. As such, the sufficiency of Plaintiffs' claims was not "decided" on appeal, and this Court is free to consider the issue on remand.[13]

---

[11] Even though *Hash* is not controlling caselaw, it is instructive. The defendant's procedural move there is similar to the one made by Defendants here. In *Hash*, the defendant moved for the district court to consider the defendant's liability despite a mandate that instructed the court to simply determine just compensation. *Hash*, 2007 WL 1309548, at *3-4. Here, Defendants ask the Court to preclude entry of default because of Plaintiffs' insufficient claims even though the mandate only explicitly required a hearing on damages.

[12] In *Hash*, the mandate said that the "owners' property interests were taken for public use, in accordance with the principles set for in the *Presault* cases." 2007 WL 1309548, at *4. The district court concluded that this was enough to conclude that the Ninth Circuit had made a liability determination, leaving the district court to determine only the amount of just compensation. *Id.* In the present case, the Mandate and accompanying Memorandum contain no such language.

[13] In *Lee v. E.I. Du Pont de Nemours and Company*, the Fifth Circuit found "where further proceedings in the district court are specified in the mandate . . . the district court is limited to holding such as are directed." 98 Fed. Appx. 271, 274-75 (5th Cir. 2004) (internal quotation marks omitted). This language would seem to suggest that since the Ninth Circuit explicitly remanded the case to hold a hearing on damages, this Court's consideration is limited to that issue alone. In *Lee*, however, there was additional language from a previous, amended opinion suggesting that the Fifth Circuit had already decided the issue the plaintiff sought to argue on remand. *Id.* Again, such suggestive language is missing from the Ninth Circuit's Mandate and accompanying Memorandum.

### b)  Law of the Case

As already noted, "a court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case." *Thomas*, 983 F.2d at 154. In order to become the law of the case, however, the issue must have actually been decided, although the decision may be implied. *Id.*

Even if an issue has been decided, a court can deviate from the law of the case under certain circumstances. First, if the previous decision or judgment has been vacated on appeal, it can no longer be part of the law of the case. *See Johnson v. Bd. of Educ. of Chicago*, 457 U.S. 52, 53-54 (1982) ("Because we have vacated the Court of Appeals' judgments in this case, the doctrine of the law of the case does not constrain either the District Court or, should an appeal subsequently be taken, the Court of Appeals."). Second, a court may deviate from the law of the case when the court is "convinced that its [previous] decision was erroneous" and "that adherence to the law of the case [would] work a grave injustice." *Bloom v. Int'l Bhd. of Teamsters Local 468*, 752 F.2d 1312, 1317 (9th Cir. 1983) (citation omitted). Absent these two circumstances, a court will generally adhere to decisions that have become the law of the case.

Here, Plaintiffs argue that the 2013 Order is the law of the case and precludes Defendants from making their insufficiency argument at this stage of the litigation. In its 2013 Order, this Court did not explicitly address the sufficiency of Plaintiffs' claims. There is a plausible argument, however, that the Court ruled on the sufficiency of Plaintiffs' claims "by necessary implication." As already discussed, insufficient claims cannot serve as the basis for a valid default judgment. Therefore, in reinstating the default judgment, this Court impliedly decided that Plaintiffs' claims were sufficient.

Even assuming arguendo that the 2013 Order established Plaintiffs' claims as sufficiently pled, the decision is not necessarily the law of the case. In its Mandate, the Ninth Circuit directed, in part, that the default judgments resulting from the 2013 Order be vacated because of this Court's failure to hold a hearing on damages. As such, this Court's decision to reinstate the default judgments – and by implication this Court's decision on the sufficiency of Plaintiffs' claims – can no longer be a part of the law of the case. Thus, even if this Court impliedly decided that Plaintiffs' claims were sufficient in its 2013 Order, the decision is not the law of the case because the judgments from which the decision derived were vacated by the Ninth Circuit.

The law-of-the-case analysis is a bit different in regard to Plaintiffs' ORICO claims. Unlike Plaintiffs' other claims, the Court *did* explicitly rule on the sufficiency of Plaintiffs' ORICO claims when it dismissed them in an Opinion and Order on November 19, 2010 ("2010 Order").[14] This dismissal came prior to the first appeal and thus prior to this Court's reinstatement of the default judgment in August 2013. Although Plaintiffs sought review of the dismissal of the ORICO claims on the first appeal, neither the Ninth Circuit on appeal nor this Court on remand addressed the dismissal. Thus, when the 2013 Order reinstated the default judgments "in full," the judgments did not include the ORICO claims. In fact, the dismissal of the ORICO claims in November 2010 has never been disrupted and remains the law of the case today. True, the law of the case is "not an inexorable command" and this Court may modify its ruling from the 2010 Order "at any time before the entry of judgment." *U.S. v. Smith*, 389 F.3d 944, 949 (9th Cir. 2004) (citation omitted) (internal quotation marks omitted). Exercising discretion in this manner is inconsequential, however, as I have determined the ORICO claims are ultimately insufficient.

---

[14] In this same order, the Court also dismissed Plaintiffs' Federal RICO claims but only because the claims were barred by the statute of limitations. The Court explicitly declined to address the sufficiency of Plaintiffs' Federal RICO claims at that time.

In summary, the law of the case does not constrain me from considering Defendants'
Motion. By necessary implication of its 2013 Order, this Court previously decided Plaintiffs'
claims were sufficient, but the Court's decision was subsequently vacated by the Ninth Circuit
and is no longer the law of the case. Thus, with the exception of Plaintiffs' ORICO claims which
were dismissed by the 2010 Order, I am free to rule on the sufficiency of Plaintiffs' claims at this
stage in the litigation.

### B. *Substantive Arguments*

Since I cannot enter a default judgment on the basis of insufficient claims, I must decide
whether Plaintiffs' claims satisfy the relevant pleading requirements. As previously noted, the
current action contains four claims: RICO, ORICO, fraud, and contract. I will discuss the
sufficiency of each type of claim in turn.

### i. Federal RICO Claim

The parties focused most of their attention on the sufficiency of Plaintiffs' RICO claim.
Although the relevant complaints fail to cite specific provisions of the statute, Plaintiffs appear to
allege violations to §§ 1962(c) and 1962(d) of RICO. Under § 1962(c), it is unlawful for a person
associated with any enterprise engaged in interstate commerce to conduct the enterprise's affairs
"through a pattern of racketeering." 18 U.S.C.A. § 1962(c) (West 2016). To state a claim under
this section, "a plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of
racketeering activity." *Sanford v. MemberWorks, Inc.*, 625 f.3d 550, 557 (9th Cir. 2010) (citation
omitted). Conspiracy to violate § 1962(c) is also unlawful. 18 U.S.C.A. § 1962(d). Although
Defendants do not appear to take issue with the first element (conduct), they argue that Plaintiffs
have failed to adequately allege the last three elements of a § 1962(c) violation. I agree and

conclude that Plaintiffs' RICO claim does not satisfy the heightened pleading requirement of Rule 9(b).

### a) Enterprise

Under RICO, "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C.A. § 1961(4). As a preliminary matter, a violation under § 1962(c) must involve two entities: "(1) a 'person' and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005). This is commonly called the distinctiveness requirement. *See id.* (noting that an enterprise consisting of only a corporation and its employees "would fail for lack of distinctiveness"). Additionally, to establish the existence of an *associated-in-fact* enterprise, a plaintiff must allege (1) a common purpose, (2) an ongoing organization, and (3) a continuing unit. *Odom v. Microsoft Corp.*, 486 F.3d 541, 552 (9th Cir. 2007).

Defendants argue that Plaintiffs' Complaints fail to satisfy the distinctiveness requirement and each element of an associated-in-fact enterprise. Defendants' argument regarding distinctiveness is incorrect. Even though an enterprise involving a corporation and its subsidiaries does not satisfy distinctiveness, a corporate officer/employee conducting the affairs of the corporation through illegal activity does. *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163-64 (2001); *Living Designs, Inc.*, 431 F.3d at 361; *Bucklew v. Hawkins, Ash, Baptie & Co., LLP*, 329 F.3d 923, 934 (7th Cir. 2003). This is because a corporate officer/employee and the corporation are legally separate entities, making them sufficiently distinct for purposes of the statute. *Cedric Kushner Promotions*, 553 U.S. at 163-64. Here, although all corporate Defendants are members of the "Zongshen family of companies,"

Plaintiffs also allege that at least three individuals – Zuo, Dexiu, and Ying – engaged in illegal activity on behalf of the corporations. These individuals are legally separate from corporate Defendants and thus Plaintiffs' claims satisfy the distinctiveness requirement.

Even though the Complaints sufficiently allege distinctiveness, they fail to adequately allege the elements of an associated-in-fact enterprise. Plaintiffs allege that Defendants had the common purpose of making money off the sale of illegal motorbikes in the United States. They fail to specify, however, the ways in which individual defendants furthered that purpose. *See Odom*, 486 F.3d at 552; *Chagby v. Target Corp.*, 358 F. App'x 805, 808 (9th Cir. 2009) (holding that merely identifying correct legal labels was insufficient to allege a common purpose between Target and its advertising agency).

Plaintiffs also fail to allege a "vehicle for the commission of two or more predicate crimes," as is required to show an ongoing organization. *Odom*, 486 F.3d at 552. In *Odom*, for example, the plaintiff alleged a mechanism by which the defendants carried out the illegal acts. *Id.* Here, Plaintiffs allege no such mechanism.

Finally, Plaintiffs' Complaints fail to sufficiently allege that Defendants' activities were continuous. The continuity requirement "focuses on whether the associates' behavior was ongoing rather than isolated activity." *Id.* at 552-53. Although Plaintiffs allude to activity that occurred in 2004 and into 2005, they do not allege specific facts to show Defendants' alleged conduct was sufficiently continuous. These vague allegations, although indications of continuity, are insufficient to satisfy the heightened pleading standard under Rule 9(b). Due to these deficiencies, Plaintiffs have failed to adequately allege an enterprise as part of their RICO claim.

**b) Racketeering Activity**

Section 1961 of RICO provides an extensive list of conduct that is considered racketeering activity. 18 U.S.C.A. §1961(1). Only two of the criminal statues to which Plaintiffs allege violations are included under § 1961(1): 18 U.S.C. §§ 1341 and 1343. Despite alleging violations to these statutes, Plaintiffs fail to plead such allegations with particularity as required by Rule 9(b). Specifically, Plaintiffs do not provide specific enough dates as to when the predicate acts occurred or associate any particular defendant with specific acts of fraud. Instead, Plaintiffs merely point to 20 particulars of mail fraud alleged in the Complaint in *Rubicon IV*; a complaint that is *not* part of this consolidated action. Thus, Plaintiffs' have failed to adequately allege that Defendants' conduct constituted racketeering activity as required under RICO.

**c) Pattern**

Finally, to properly state a federal RICO claim under § 1962(c), a plaintiff must allege that the racketeering activity discussed above amounted to a pattern. *Odom*, 486 F.3d at 547. Interpreting RICO's legislative history, the Supreme Court found that "to prove a pattern of racketeering activity a plaintiff . . . must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). In their motion, Defendants do not take issue with the relatedness requirement but argue that Plaintiffs fail to allege activity that would satisfy the continuity requirement.

Plaintiffs correctly assert that continuity is a "fluid" concept. Thus, it is difficult to say exactly how long the activity must occur in order to constitute a substantial period of time. Although the time frame and specific interactions are vague, Plaintiffs suggest that their relationship with Defendants began in the spring of 2004 and lasted until sometime in 2005.

Giving Plaintiffs the benefit of the doubt, this means that the allegedly fraudulent activity lasted at least eight to nine months. Even though acts "extending over a few weeks or months" do not generally satisfy the requirement, *H.J. Inc.*, 492 U.S. at 242, eight or nine months might be enough to constitute a substantial period of time. Regardless, the alleged activity amounts to a single fraudulent transaction, thereby failing the continuity requirement.

Of particular interest is the case of *Medallion Television Enters., Inc. v. SelecTV of Cal., Inc.*, 833 F.2d 1360 (9th Cir. 1987). There, the court noted that all the defendant's assertions and communications with the plaintiff were part of "a single fraudulent inducement to enter a contract." Because it was an "isolated transaction[] with no indication that the defendant would need to commit further predicate acts," it was not a "pattern" for purposes of RICO. Here, Plaintiffs allege only one transaction: the order of three containers of motorbikes. There is nothing to indicate that each container was part of a separate transaction or that similar transactions were made with other parties. Defendants made several representations and communications to Plaintiffs, but they were all part of the single transaction to purchase the three containers of motorbikes.

On a more practical note, Congress's principal concern in enacting RICO was to get at "long-term criminal conduct." *H.J. Inc.*, 492 U.S. at 242. Even though Defendants' conduct here may have been fraudulent, it does not seem to be the type of long-term criminal activity that RICO was meant to address. The application of RICO is admittedly broad, but it is more aptly aimed at enterprises that commandeer legitimate businesses for criminal purposes or engage in systemic fraudulent activity. Defendants' conduct, even if true as alleged, does not fit this mold. In fact, on the basis of the Complaints, it is difficult to say whether Defendants have engaged in similar activity in the past or will continue to do so in the future. Thus, in terms of plain

meaning, the conduct alleged here does not seem to rise to the level of "a pattern of racketeering activity."

### ii. Oregon RICO Claim

As already discussed above, this Court's 2010 Order dismissing Plaintiffs' ORICO claim remains in effect. In any event, Plaintiffs' ORICO claim suffers in large part from the same deficiencies as their RICO claim and is therefore insufficiently pled. *See Pincetich v. Jeanfreau*, 699 F. Supp. 1469, 1475 (D. Or. 1988) (citing *Ahern v. Gaussoin*, 611 F. Supp. 1465, 1494 (D. Or. 1985)) (finding that RICO and ORICO are "almost identical" and the should be interpreted consistently).[15]

### iii. Common Law Fraud Claims

Plaintiffs' fraud claim also fails under Rule 9(b) because they fail to provide the who, what and when of the alleged misconduct. *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).

First, Plaintiffs fail to identify the particular acts of fraud that each defendant committed. *See Zing Toys, Inc. v. Zuru, LLC*, No. 3:10-cv-863-MO, 2011 WL 2935404, at *3 (D. Or. July 15, 2011). Plaintiffs argue the Complaints identify Zuo Zongshen as the one who made the misrepresentations and argue that this is sufficient to plead fraud against the corporate entities in the case. This argument misses the mark. Even though the Complaints specifically identify Zuo as the one who made "certain false representations," it does not state what those representations actually were. The Complaints also specifically identify Dexiu and Ying, but the allegations against them are likewise vague and insufficient. All other allegations throughout the Complaints relating to common law fraud are attributed to Defendants collectively rather than individual

---

[15] I recognize a potential issue dealing with proximate cause but fail to address the issue because the ORICO claim remains dismissed.

actors. Thus, Plaintiffs' fraud claim fails under Rule 9(b) because the Complaints fail to attribute specific acts of fraud to particular defendants.

The Complaints also fail to sufficiently allege the "when" of the alleged fraud.   In their Complaints, Plaintiffs allege "April" or "spring" of 2004 as the time when Defendants' agents approached and encouraged Plaintiffs to invest in the motorbikes. Regardless of whether "April" or "spring" are sufficiently definite for purposes of Rule 9(b), the timing seemingly only refers to the initial interactions between the parties. All other interactions, including those that were allegedly fraudulent, occurred sometime in 2004 or 2005. The vagueness of Plaintiffs' complaints regarding these dates and when the fraud actually occurred prevents them from satisfying the heightened pleading requirement of Rule 9(b).

### iv.  Common Law Contract Claims

Finally, like their other claims, Plaintiffs' contract claims also fail to satisfy the relevant pleading standard, this time Rule 8(a). In their *Rubicon I* Complaint, Plaintiffs assert three contract-based claims: breach of contract, breach of the covenant of good faith and fair dealing, and breach of the warranty of merchantability. Defendants argue these claims are insufficient because the pleadings fail to identify a specific contract, let alone the terms or conditions of any agreement. I agree with Defendants and conclude Plaintiffs have failed to properly plead their contract claims.

Plaintiffs' assertion of a contract is somewhat murky. In fact, the *Rubicon I* Complaint never explicitly identifies the contract on which Plaintiffs' claims are based. Language from the Complaint suggests that contract at issue is the "joint venture" entered into by the parties. In their Response to the current Motion, however, Plaintiffs seem to assert that the contract-based claims arise from their order of "three containers of motor bikes." Thus, whether the contract-based

claims arise from the agreement to form a joint venture or the agreement to purchase the bikes is somewhat unclear.

Even if Plaintiffs adequately allege a contract, however, they fail to identify the terms of the agreement or the obligations Defendants failed to fulfill. Under their claim for breach of contract, for example, Plaintiffs merely assert that they "have performed all conditions precedent" without saying what those conditions actually were. The claims for breach of the implied warranty of merchantability and the breach of the covenant of good faith and fair dealing rely on similarly insufficient legal conclusions. Because the *Rubicon I* Complaint offers only "labels and conclusions" or "'naked assertion[s]' devoid of 'further factual enhancement,'" Plaintiffs' contract claims do not meet the pleading standard under Rule 8(a). *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## CONCLUSION

Plaintiffs sufficiently proved damages in the amount of $305,550, which, when trebled, would result in a damages award of $916,650. The claims asserted in its three operative Complaints, however, are insufficiently pled under the relevant pleading standards. As such, I GRANT Defendants' Motion [303] and preclude the entry of default judgment in this consolidated action. Plaintiffs are awarded no damages but are given leave to amend their Complaints.

IT IS SO ORDERED.

DATED this ___30th___ day of December, 2016.

/s/ Michael W. Mosman
MICHAEL W. MOSMAN
Chief United States District Judge

29 – OPINION AND ORDER